UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 03-20010-CIV-SEITZ

ABEL RIZO,

      Petitioner,

v.

UNITED STATES,

      Respondent.

_____/

## REPORT AND RECOMMENDATION RE: PETITIONER'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

**THIS CAUSE** came before the undersigned upon an Order of referral from the Honorable Patricia A. Seitz, United States District Judge for the Southern District of Florida, to conduct an evidentiary hearing on Petitioner Abel Rizo's claim that trial counsel was ineffective for failing to interview or call alibi witnesses, as set forth in his Motion to Vacate, Set Aside, or Reduce Sentence Pursuant to Title 28 U.S.C. § 2255. (ECF No. 1, 45). A two-day evidentiary hearing was held before the undersigned on July 26 and 27, 2012, during which the court received in evidence the testimony of nine witnesses and numerous exhibits. (ECF No. 53, 54). In lieu of closing arguments, the parties submitted post-hearing memoranda. (ECF No. 59, 60). The undersigned has given extensive consideration to the written and oral arguments of counsel, the testimonial and documentary evidence, the voluminous court record, the applicable law, and is otherwise duly advised in the premises.

## Summary Procedural Background

The relevant facts underlying Petitioner Abel Rizo's criminal case and appeal are fully set

forth in the appellate opinion entered by the Eleventh Circuit Court of Appeals in United States v.

Gallego, 247 F .3d 1191 (11th Cir. 2001). By way of summary, on October 9, 1996, Rizo was

indicted "on charges of conspiracy, possession of cocaine, robbery, and firearms violations," to

which he pled not guilty. Id. at 1194. On March 4, 1997, this case proceeded to trial against six

defendants: Petitioner Abel Rizo, his father, Evelio Rizo Sr., Jerry Crespo, Leonardo Cuellar, Lazaro

Gallego, and Felix Gallego. Rizo was convicted on all charges after a 25-day jury trial before the

Honorable Shelby Highsmith. [Verdict (ECF No. 509), Case No. 96-0075-Cr-Highsmith]. The jury

found Rizo guilty of the following crimes: Count 1–Conspiracy to possess cocaine, with intent to

distribute, from June 25, 1987 to March 1995; Count 2–Possession of cocaine, with intent to

distribute, on June 29, 1992; Count 3–Obstruction or delay of commerce by robbery ("Hobbs Act

robbery") on June 29, 1992 ["Lozano Robbery"]; Count 4–Using and carrying a firearm during the

commission of a crime of violence and drug-trafficking crime on June 29, 1992; Count 8–Attempted

Hobbs Act robbery on April 30, 1993 ["Cano Robbery"]; Count 9–Attempted Hobbs Act robbery

on November 24, 1993 ["De la Torre Robbery"]; and Count 10 –Using a carrying a firearm during

the commission of a crime of violence and drug-trafficking crime on November 24, 1993. Rizo was

sentenced to a total of 468 months' imprisonment and five years of supervised release. [Judgment

(ECF No. 663), Case No . 96-0075-Cr-Highsmith].[1]

---

[1] Rizo is presently serving his sentence at the Federal Correctional Institution in Manchester, Kentucky. (ECF No. 52).

On August 28, 1997, Rizo appealed his conviction to the Eleventh Circuit Court of Appeals. [Notice of Appeal (ECF No. 678), Case No. 96-0075-Cr-Highsmith]. On April 13, 2001, the Eleventh Circuit affirmed Rizo's conviction. Gallego, 247 F.3d at 1201. The United States Supreme Court denied Rizo's Petition for Writ of Certiorari on January 7, 2002, Rizo v. United States, 534 U.S. 1084 (2002), thus making his conviction final. See Washington v. United States, 243 F.3d 1299, 1300-1301 (11th Cir. 2001) ("We are persuaded by the analysis of our sister circuits and hold that [the defendant's] conviction became final on . . . the day the Supreme Court denied his certiorari petition").

On January 3, 2003, Rizo filed a timely Motion to Vacate, Set Aside, or Reduce Sentence Pursuant to Title 28 U.S.C. § 2255, Request for Evidentiary Hearing, and Incorporated Memorandum of Law. (ECF No. 1). Specifically, Rizo alleged that his trial counsel, Lance Armstrong, Esq. ("Armstrong"), failed to (1) interview or call several alibi witnesses; (2) object to the government's vouching for the testimony of the cooperating witnesses; (3) provide the trial Court with Petitioner's school and medical records, which would have demonstrated that non-cooperating witnesses did not describe anyone with Petitioner's physical characteristics; and (4) interview Lambuth University professors, obtain sign-in sheets, and obtain football and medical records, which would have proved that Rizo was not present at the 1993-1994 crime scenes. Id. On November 11, 2003, the government filed an answer arguing that Rizo had failed to meet his burden of proof that Armstrong's acts or omissions were unreasonable, and that the habeas petition should be denied without an evidentiary hearing. (ECF No. 5).

On May 15, 2006, the undersigned issued a Report and Recommendation denying the request for an evidentiary hearing on the ineffective assistance of counsel claims, because the

pertinent facts of the case were fully developed in the record. (ECF No. 23). The Court specifically found that Rizo had failed to establish prejudice due to Armstrong's failure to present alibi witnesses, to discredit the testimony of cooperating witnesses, and to introduce school football and medical records to support Rizo's claim. Despite Rizo's objections to the Report and Recommendation (ECF No. 29), Judge Highsmith entered an Order adopting the report in full, and closed the case on August 30, 2006. (ECF No. 30). Subsequent Motions for Reconsideration were denied. (ECF No. 31, 32, 33).

On October 19, 2006, Rizo filed a Notice of Appeal (ECF No. 34) to the Eleventh Circuit Court of Appeals, appealing the Order Adopting Report and Recommendation denying Motion for Leave to Supplement Petitioner's Motion to Vacate, Set Aside, or Reduce Sentence (ECF No. 19); Order Adopting Report and Recommendation recommending denial of Motion to Vacate, Set Aside, or Reduce Sentence Pursuant to Title 28 U.S.C. § 2255 (ECF No. 30); and Order Denying Motion for Reconsideration (ECF No. 33). On December 14, 2010, the Honorable Patricia A. Seitz granted-in-part certification of appealability only as to whether the District Court erred in denying Petitioner's claim that his trial counsel was ineffective for failing to interview or call alibi witnesses without holding an evidentiary hearing. (ECF No. 38).[2]

On November 15, 2011, the Eleventh Circuit vacated the District Court's Order adopting the report (ECF No. 30), and remanded the case with the instruction that the court hold an evidentiary hearing on Petitioner's ineffective assistance claim. Rizo v. United States, 446 Fed. App'x 264 (11th Cir. 2011). The mandate issued on February 6, 2012. (ECF No. 44).

---

[2]The record indicates that the case was reassigned to Judge Seitz on January 12, 2010. (ECF No. 37).

Judge Seitz then referred the matter to the undersigned to conduct an evidentiary hearing on the ineffective assistance of counsel claim. (ECF No. 45). The matter was scheduled for hearing on May 2, 2012. (ECF No. 46). The hearing was rescheduled for July 26, 2012, at Petitioner's request, due to witness and counsel availability. (ECF No. 49, 50, 51). The hearing was held on July 26th and 27th, 2012. (ECF No. 53, 54).

## Habeas Petition

Rizo sought relief under 28 U.S.C. § 2255 claiming ineffective assistance of counsel under the Sixth Amendment, which entitles criminal defendants to the "effective assistance of counsel." Bobby v. Van Hook, 558 U.S. 4, 7, 130 S. Ct. 13, 16, 175 L.Ed.2d 255 (2009).[3] Before the Court is Rizo's claim that his trial counsel provided ineffective assistance in failing to conduct an investigation of the facts and in failing to pursue potential alibi witnesses that would have placed him elsewhere at the time of the crimes for which he was convicted.

## Ineffective Assistance of Counsel

In order to prevail on a claim of ineffective assistance of counsel, Rizo must show, by a preponderance of the evidence, the two-pronged standard established in Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L.Ed.2d 674, reh'g denied, 467 U.S. 1267, 104 S. Ct. 3562 (1984). He must demonstrate "first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." Id. at 669. The guiding principle for assessing ineffective assistance of counsel claims is whether there

---

[3] A prisoner is entitled to relief under § 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded the court's jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack. 28 U.S.C. § 2255; United States v. Phillips, 225 F.3d 1198, 1199 (11th Cir. 2000); United States v. Walker, 198 F.3d 811, 813, n. 5 (11th Cir. 1999).

was a fair trial. Id. at 687. The courts are free to dispose of ineffectiveness claims on either of Strickland's two grounds. Sims v. Singletary, 155 F.3d 1297, 1305 (11th Cir. 1998) (citing Oats v. Singletary, 141 F.3d 1018, 1023 (11th Cir. 1998)).

Under the performance prong, to demonstrate that trial counsel's performance was deficient, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. Overall, the proper measure of attorney performance is reasonableness under the prevailing professional norms. Id.; Lott v. Att'y Gen. Fla., 594 F.3d 1296, 1301 (11th Cir. 2010). When assessing claims of ineffective assistance of counsel, there is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment, Strickland, 466 U.S. at 690, and that counsel's conduct falls within the wide range of "reasonably effective assistance." Id. at 687.

To meet the prejudice requirement, a petitioner "must show that there is a reasonable probability sufficient to undermine confidence in the outcome." Chandler v. U.S., 218 F.3d 1305, 1314 (11th Cir. 2000). Thus, a petitioner must show that, but for counsel's "unprofessional errors, the results of the proceedings would have been different." Strickland, 466 U.S. at 694. The burden of proof remains on the petitioner at all times. Roberts v. Wainwright, 666 F.2d 517, 519, n.3 (11th Cir. 1982). With respect to a petitioner's burden, "[i]t is not enough for the [petitioner] to show the errors had some conceivable effect on the outcome of the proceeding ...," because "[v]irtually every act or omission of counsel would meet that test." Strickland, 466 U.S. at 693. Similarly, it is well-settled that "a petitioner cannot establish an ineffective assistance claim simply by pointing to additional evidence that could have been presented." Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318, 1324 (11th Cir. 2002); See Parker v. Allen, 565 F .3d 1258 (11th Cir. 2009) ("Additional, but

cumulative, evidence which could have been presented does not, however, establish ineffective assistance").

When examining counsel's performance, judicial scrutiny must be highly deferential to counsel, and every effort should be made to reduce the "distorting effects of hindsight." Strickland, 446 U.S. at 679. In this regard, a petitioner must overcome the presumption that "the challenged action might be considered sound strategy." Id. at 689. This standard is highly deferential, and second-guessing is impermissible. Spaziano v. Singletary, 36 F.3d 1028, 1039 (11th Cir. 1994). Indeed, tactical decisions within the range of reasonable professional competence are not subject to collateral attack. Lindsey v. United States, Nos. 08-80988-Civ, 04-80023-Cr, 2009 WL 5863461, at *11 (S.D. Fla. Nov. 17, 2009) (citing Strickland, 466 U.S. at 690-91) (An attorney's "strategic choices, made after thorough investigation of law and facts relevant to plausible options, are virtually unchallengeable").

While there is no absolute duty to investigate, the law requires counsel to "conduct a substantial investigation into any of the client's plausible lines of defenses," including an alibi defense. House v. Balkcom, 725 F.2d 608, 617-18 (11th Cir. 1984); Weidner v. Wainwright, 708 F.2d 614, 616 (11th Cir. 1983); McCoy v. Newsome, 953 F.2d 1252, 1263 (11th Cir. 1992); Futch v. Dugger, 874 F.2d 1483, 1486 (11th Cir. 1989); Code v. Montgomery, 799 F.2d 1481, 1483-84 (11th Cir. 1986). That being said, "counsel for a criminal defendant is not required to pursue every path until it bears fruit or until all available hope withers." Solomon v. Kemp, 735 F.2d 395, 402 (11th Cir. 1984) (internal quotation marks omitted). Defense counsel must only conduct a pretrial investigation that is reasonable under the circumstances. Futch, 874 F.2d at 1486. "The reasonableness of the investigation is determined by the information conveyed to counsel by his

client, as well as other information in his possession, recognizing 'the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources.'" Denis v. United States, No. 05-23089-CIV, 2009 WL 1563543, at *16 (S.D. Fla. Jun. 2, 2009) (quoting Chandler, 218 F.3d at 1318, n. 22 and surrounding text).

The manner of investigating or presenting a particular line of defense "is a matter of strategy and is not ineffective unless the petitioner can prove that the chosen course, in itself, was unreasonable." Brownlee v. Haley, 306 F.3d 1043, 1060 (11th Cir. 2002) (internal quotation marks omitted). Pursuant to Strickland, so long as "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation," counsel's pre-trial investigation does not constitute ineffective assistance of counsel. Strickland, 466 U.S. at 690-91. "Even if counsel's decision appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was so patently unreasonable that no competent attorney would have chosen it." Adams v. Wainwright, 709 F.2d 1443, 1445 (11th Cir.1983); Dingle v. Secretary for Dept. of Corrections, 480 F.3d 1092, 1099 (11th Cir. 2007) (internal quotation marks and citations omitted). "[T]rial counsel's performance must be measured against what he knew or should have been expected to know at the time of his investigation." Mikell v. Terry, No. 1:10-CV-0735-TWT-JSA, 2012 WL 6214622, at *20 (N.D. Ga. Oct. 25, 2012) (citing Rhode v. Hall, 582 F.3d 1273, 1280 (11th Cir. 2009) ("We review counsel's performance from counsel's perspective at the time, to avoid the distorting effects of hindsight.") (citation and quotes omitted)). The reasonableness of counsel's challenged conduct on the facts of the case, when viewed as of the time of counsel's conduct, decides an ineffectiveness claim. Strickland, 466 U.S. at 690.

In this case, Rizo claimed that he and his wife, Juliana Waterman, provided Armstrong with the names and contact information for several alibi witness, whom Armstrong failed to contact. Where a claim of ineffective assistance is based on counsel's failure to call a witness, the burden to show prejudice is heavy, because "the presentation of testimonial evidence is a matter of trial strategy, and because allegations of what a witness would have testified are largely speculative." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir.1978) (citations omitted); United States v. Guerra, 628 F.2d 410, 413 (5th Cir. 1980); Sullivan v. DeLoach, 459 F.3d 1097, 1109 (11th Cir. 2006). Determinations concerning the presentation of witnesses are exemplary of strategic decisions tasked to an attorney. Conklin v. Schofield, 366 F.3d 1191, 1204 (11th Cir. 2004) (calling witnesses is a strategic choice); Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess"); Blanco v. Singletary, 943 F.2d 1477, 1495 (11th Cir. 1991) ("The decision as to which witnesses to call is an aspect of trial tactics that is normally entrusted to counsel"). As noted *supra*, courts avoid second-guessing such strategic choices. See Adams, 709 F.2d at 1445 (trial strategy only amounts to ineffective assistance of counsel "if it was so patently unreasonable that no competent attorney would have chosen it"); Dingle, 480 F.3d at 1099 ("In short, considering all the circumstances, we give great deference to choices dictated by reasonable strategy").

Finally, the Eleventh Circuit has generally recognized that effective assistance of counsel does not entail errorless assistance. Green v. Zant, 738 F.2d 1529, 1536 (11th Cir.), cert. denied, 469 U.S. 1098 (1984). "To state the obvious: trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But the issue is not what is possible or

what is prudent or appropriate, but only what is constitutionally compelled." Chandler, 218 F.3d at

1313 (quoting Burger v. Kemp, 483 U.S. 776, 794, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987)

(citations and quotations omitted)). "The test has nothing to do with what the best lawyers would

have done. Nor is the test even what most good lawyers would have done. We ask only whether

some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted

at trial . . . ." Waters, 46 F.3d at 1512.

### Remanded Issue

Rizo claimed that Armstrong provided ineffective assistance by failing to contact and present

alibi witnesses on his behalf. Rizo claimed that he and his then-wife provided Armstrong with the

names and contact information for nine individuals who would have testified that Rizo was not

present at the scenes of the crimes testified to by the cooperating witnesses. Rizo alleged that

Armstrong's failure to investigate and call these alibi witnesses prejudiced him at trial. The

government's position was that, *inter alia*, Armstrong was given insufficient information for the alibi

witnesses.

Seven witnesses appeared at the evidentiary hearing before the undersigned to outline the

testimony that they would have provided at trial had they been called as alibi witnesses: Juliana

Waterman, Rizo's former wife;[4] Coach Victor Don Wallace, Rizo's football coach; Eugene Grant

Poole, Jr., Rizo's roommate; Sven Ouderdorp, Rizo's teammate; Mark Alan Gadwell, Rizo's

teammate; Kimberly Simmons Ingram, Juliana's roommate; and Joe Meadow, Juliana's father. Their

---

[4]Rizo and Juliana were married at the time of his arrest in 1996 and during the trial in 1997. At the
time of the hearing before the undersigned, they were divorced.

affidavits, executed years after the trial, are of record as well. (ECF No. 1, 3, 4).[5]

In this regard, "[t]he Court notes that post-trial, self-serving affidavits, such as those relied upon here by Rizo, are generally viewed as suspect." See Arthur v. Allen, 452 F.3d 1234, 1246 (11th Cir. 2006) ("[E]xculpatory affidavits 'produced ... at the 11th hour with no reasonable explanation for the nearly decade-long delay' are 'suspect'") (quoting Herrera v. Collins, 506 U.S. 390, 423, 113 S. Ct. 853, 122 L.Ed.2d 203 (1993) (O'Connor, J., concurring)).

## Pre-Trial Background

Armstrong became Rizo's attorney on August 30, 1996. (ECF No. 214); Tr. 7/27 116:17-19.[6] Prior to Armstrong's involvement in this case, Rizo was being represented by Howard Sohn.[7] Sohn had previously represented Rizo on state robbery charges that were dismissed and had also represented Rizo's brother, who was a co-defendant in this case, in other matters. Tr. 7/27 84:10-13.

As noted *supra*, in determining the reasonableness of Armstrong's actions with respect to the witnesses, the Court looks to the sources of information available to Armstrong at the time he undertook Rizo's representation: the government's discovery, which pertained to the Lozano, Cano, and De la Torre crimes, the materials and information provided by Sohn, and the information provided by Rizo and Juliana. Chandler, 218 F.3d at 1318, n.2 ("The reasonableness of the investigation is determined by the information conveyed to counsel by his client, as well as other information in his possession"); Denis, 2009 WL 1563543, at *16 (same). The rest of Rizo's family

---

[5]There is no affidavit of record for Eugene Grant Poole, Jr.

[6]References to the transcripts of the evidentiary hearing before the undersigned shall be cited as "Tr. [date] [page number] : [line]."

[7]Sohn also represented a co-defendant, Miguel Tapia, who was charged in, and implicated Rizo in, the June 29, 1992 Lozano robbery. Tr. 7/27 86:2.

was also allegedly involved in the same criminal conduct in this case, thus they were unavailable to Armstrong as sources of information.[8]

Neither the government's discovery nor Sohn's materials provided Armstrong with alibi witness information. The information that was conveyed to Armstrong by Rizo and Juliana regarding alibi witnesses is in dispute. Thus, the issue of ineffective assistance due to failure to investigate and call alibi witnesses is contingent upon the Court's credibility determination among the witnesses.

### Sources of Information

With respect to the indictment, the government's discovery demanded a notice of alibi for the counts pertaining to the Lozano (June 29, 1992), Cano (April 30, 1993 and March/April 1993), and De La Torre (November 24, 1993) crimes. Rizo was also named in one overt act listed in the conspiracy count of the indictment that did not correspond to a substantive count. That overt act related to what was referred to as the Puerto Rico rip off, which occurred on or about the end of July 1992. The Court notes that all of the purported alibi witnesses were familiar with Rizo after he started Lambuth University in the fall of 1992. Moreover, there was no indication that Rizo would be implicated in criminal conduct after November 24, 1993, because information regarding what was referred to as the Carmelo rip off, which occurred in March and April of 1994, did not arise until the middle of trial.[9]

Armstrong testified that he met with Sohn twice to review Rizo's case. Tr. 7/27 118:1.

---

[8] Rizo's mother and brother, who were alleged to have participated in the same criminal conduct as Rizo, were fugitives. Rizo's father was also indicted and stood trial with Rizo.

[9] Indeed, Armstrong testified that Rizo's alleged involvement in the Carmelo rip off in March and April of 1994 was one of those "federal surprises that you often encounter in a federal trial." Tr. 7/27 130:13.

According to Juliana's testimony, she had handwritten a letter to Sohn that included Rizo's school transcripts for 1992 through 1996, which he had requested. Tr. 7/26 167:1, 16-17; 168:3-4. A copy of the original, undated letter was introduced as an exhibit at the hearing. Rizo Exh. 6. Armstrong testified that he never received a copy of that letter. Tr. 7/27 193:20-22. Juliana confirmed that she did not provide the letter to Armstrong. Tr. 7/26 174:23-24. In fact, Juliana was unable to produce proof that the letter was sent to Sohn. Tr. 7/26 175:19-22. Juliana testified that attached to the letter were school records for the years 1992 through 1996. Tr. 7/26 168:19-21 . In cross-examination, the prosecution alerted Juliana to the fact that the letter was dated June 21, 1993. Tr. 7/26 177:7-8. When asked to explain the inconsistency in the dates, she claimed that the date on the letter was a typographical error. Tr. 7/26 177:10-13. In any case, the letter did not mention any alibi witnesses. In fact, there was no indication that Sohn was ever told of the alibi witnesses in the course of his representation of Rizo. Given their prior relationship, it would seem likely that Rizo would have immediately provided Sohn with the names of the alibi witnesses that he claimed to have provided to Armstrong. Notably, Sohn was not called to testify at the evidentiary hearing.

Armstrong testified that, with respect to the Cano Robbery (April 30, 1993), and De la Torre Robbery (November 24, 1993), Rizo told Armstrong that he arrived in Miami a day or two before each relevant date. Tr. 7/27 151:1-16; 169:12-25. Rizo gave him some names, and when asked whether they would be able to say that Rizo was in Tennessee, or not in Miami, on the dates of the alleged crimes, Rizo responded, "not exactly." Tr. 7/27 126:10-13; 12-15. Notwithstanding, Armstrong asked for the contact information for these witnesses, but Rizo told him that Juliana had their phone numbers. Tr. 7/27 126:18-19. At the hearing, Rizo admitted that, prior to trial, he did not provide Armstrong with any phone numbers or addresses for these witnesses, Tr. 7/27 88:3-12, 20-

25; 101:5-6, nor did he provide any details as to what he was doing with those witnesses at the relevant times, Tr. 7/27 63:19-25; 65:3-7. Rizo testified that, initially, he did not even provide Armstrong with the contact information for Juliana. Tr. 7/27 64:18-25; 88:10-12, 20-25.

Armstrong testified that he tried to contact Juliana, unsuccessfully, from September through November 1996. Tr. 7/27 126:19-21. Armstrong advised Rizo of his failed attempts at communicating with her and told Rizo to have the witnesses contact his office instead. Tr. 7/27 126:22-24. However, according to Armstrong, nothing materialized. Tr. 7/27 127:2. Rizo denied that Armstrong told him to have the witnesses call his office. Tr. 7/27 65:10-15.

According to Armstrong, he first spoke to Juliana in December 1996, about four months after he had come into the case. Tr. 7/27 129:7-9. Armstrong told her, "I need people who are going to testify that he [Abel] was in Tennessee or with somebody on specific dates. You get these witnesses, you have them call me. There's my cell phone number, there's my office number. You have them call me." Tr. 7/27 129:18-23.

Juliana testified that she first attempted to contact Armstrong in September 1996. Tr. 7/26 166:18-19. However, in her 2003 affidavit, she stated that the first time she telephoned Armstrong was in December 1996, which was consistent with Armstrong's testimony regarding their first contact. Juliana Aff. ¶ 30.[10] As noted by the government, Kimberly Simmons had executed an affidavit three months after Juliana's affidavit, stating that Simmons had contacted Armstrong in September 1996. It appears as though Juliana was attempting to reconcile her testimony with the statements set forth in Simmons' affidavit. Juliana testified that, in December 1996, she discussed specific alibi witnesses with Armstrong. Tr. 7/26 169:17-19. In her 2003 affidavit, Juliana stated that,

---

[10]References to affidavits shall be cited as [Name] Aff. ¶ [Number].

in December of 1996, she sent Armstrong, via facsimile, the names, addresses, and telephone numbers of eight potential alibi witnesses. Juliana Aff. ¶ 33. However, she could not find the facsimile. Tr. 7/26 175:19-22; 199:24-25; 200:1.

Rizo testified that he informed Armstrong of five possible alibi witnesses: his grandfather, Ignacio Velasquez, his wife, Juliana, her roommate, Kimberly Simmons, his roommate, Eugene Poole, and his teammate, Mark Gadwell.[11] Tr. 7/27 45:7-9. In an affidavit executed in 2002, Rizo stated that, "specifically, prior to trial," he provided Armstrong with a list of nine witnesses. Tr. 7/27 100:23-25; 101:1-4. Interestingly, included in that list were the names of witnesses pertaining to the uncharged 1994 Carmelo rip off which, undeniably, did not become an issue until the middle of trial in March of 1997. At the hearing, when asked how, prior to trial, he could have known that Sven Ouderdorp, Joachim Salo, and some others would be relevant as alibi witnesses when he did not find out about the Carmelo rip off until the middle of trial, Rizo admitted that there was no way he could have known that all of those individuals would have had relevant information at the time he executed the affidavit. Tr. 7/27 102:19-22.

Juliana testified that she contacted all of these witnesses prior to trial to ascertain their availability. Tr. 7/26 172:16-19. Simmons testified that Juliana contacted her prior to Rizo's trial and asked her to contact Armstrong. Tr. 7/26 98:12-14. However, both Poole and Gadwell testified at the hearing that they were first contacted for sentencing, not trial. Tr. 7/26, 66:21; 67:8-11;127:3-5, 14-16. Moreover, Gadwell testified that he was contacted by Rizo's attorney, not Juliana. Tr. 7/26 127:14-16. Gadwell's affidavit provided that he informed Juliana of his availability to testify prior

---

[11] Gadwell testified that he had a drug problem since approximately 2004. Tr. 7/26 124:17-22. He testified that he was convicted for attempted trafficking in Oxycontin. Tr. 7/26 125:7-8; 129:1-2. However, he did not have a drug problem when he executed his affidavit in 2003. Tr. 7/26 126:5-8.

to Rizo's trial and that Juliana had advised him that she had given his information to Rizo's trial counsel. Gadwell Aff. ¶ 6. At the hearing, Gadwell testified that Juliana never contacted him prior to the trial. Tr. 7/26 127:12-16. He testified that because he did not know when Rizo's trial was he could not be sure whether his contact with Juliana happened prior to or after the trial. Tr. 7/26 136:2-4. In fact, Gadwell thought he was coming to testify at the trial when he showed up at the sentencing hearing. Tr. 7/26 136:10-11.

Armstrong testified that alibi was part of the vocabulary of the case from the beginning. Tr. 7/27 141:2-5. He knew that Rizo was going to school at the time. Tr. 7/27 126:11. Armstrong's philosophy is that an alibi could do more harm than good, unless it was airtight. He testified that, from his experience, "one of the worst things you can do is put on a non-airtight alibi," because it "shifts the whole dynamics of a trial." Tr. 7/27 115:11-14. Armstrong explained that, until a defendant starts to put on evidence, one of the best arguments is the government's heavy burden of proof in a criminal case. Tr. 7/27 115:15-17. But, once a defendant puts on an alibi witness, and "the holes can be poked in that alibi, then the jury has lost sight of the fact that it's the government's burden of proof and begins to focus on your failure to prove your aspect of the case." Tr. 7/27 115:14-22. Armstrong testified that, in over 30 years in practice, he has never presented an alibi defense in court. Tr. 7/27 116:8-9. In fact, he testified that two of the co-defendants in this case presented what he would call "a sloppy alibi," and they were convicted. Tr. 7/27 116:14-15.

### Testimony of Witnesses in Relation to Offenses

**Lozano Robbery: Counts 2, 3, 4 – June 29, 1992; Puerto Rico Rip Off: Count 1 – July 1992; Carmelo Rip Off: Not charged in the indictment – March & April 1994.**

The Court will not address the Lozano Robbery and the Puerto Rico rip off, both in the

summer of 1992, or the Carmelo rip off in March/April of 1994. With respect to the incidents charged in the summer of 1992, Rizo's grandfather's testimony at the sentencing hearing is of record. A review of the testimony offered by Mr. Velasquez at the sentencing hearing reveals that he was not able to vouch for Rizo's whereabouts on the relevant dates. As Rizo acknowledged in his habeas petition, Mr. Velasquez admitted that his memory had faded with the passage of time from 1992 to the date of his testimony in 1997, and could not account for Rizo's whereabouts for every day of July 1992. Rizo had no further witnesses for this time period, which preceded his attendance at Lambuth University. Tr. 7/27 58:20-25. Thus, there was no sustainable alibi for these offenses.

With respect to the Carmelo rip off, as noted previously, it was not charged in the indictment and did not arise until the middle of trial. Thus, prior to trial, Armstrong would have had no reason to believe that this time period would be relevant or to have investigated an alibi therefor. Rizo's claim for lack of investigation cannot stand in regard to this offense.

**Cano kidnapping and robbery: Counts 1 and 8 – April 30, 1993; March/April 1993**

Rizo was charged in count 8 with participation in the kidnaping and subsequent robbery of Edison Cano in Hialeah, FL, on April 30, 1993. Rizo contended that he provided Armstrong with the names of the following witnesses who would have testified that Rizo was elsewhere during the relevant date: Juliana, Simmons, Coach Wallace, Gadwell, and Poole.

In her affidavit, dated three months prior to the affidavit executed by Simmons, Juliana stated that, on April 29, 1993, they packed Simmons' car, and Rizo left campus. Juliana Aff., ¶ 6. At the hearing, Juliana testified that it took several hours over April 29th and April 30th to pack Simmons' car, and that Rizo and Poole left at about noon on April 30, 1993. Tr. 7/26 158:11-15; 203:21-23. She admitted that her affidavit failed to mention the date April 30th, Tr. 7/26 184:9-12, but claimed

that it was a mistake. Tr. 7/26 203:4-5. As noted by the government, Juliana had sat through the trial and knew what dates were important. Tr. 7/26 184:23-25.

Poole had trouble recalling the exact length of the final exam period in April of 1993. Tr. 7/26 52:16-19; 53:8-10; 55:12-19; 56:4. He testified that his last day on campus was April 30, 1993, Tr. 7/26 50:16-17, and that was when he helped Simmons pack her car. Tr. 7/26 56:10-11. He further testified that he left campus with Rizo, approximately at noon, on April 30, 1993, and did not arrive in Florida until the afternoon or evening of the next day. Tr. 7/26 57:10-11; 16-18. On cross-examination, he testified that he helped Juliana and Simmons pack Simmons' car, which took about an hour, after final exams on April 29, 1993. Tr. 7/26 65:3-4, 16-20.

Coach Wallace could not say with certainty on which days Rizo had sat for final exams during the exam period, which went from April 26, 1993, through April 29, 1993. Tr. 7/26 42:16-20. He testified that he could not say whether Rizo was present on campus on April 30, 1993, Tr. 7/26 37:20-23, but that Rizo never missed a single practice or training session in April of 1993. Tr. 7/26 29:15-20.

Gadwell's affidavit provided that he saw Rizo during the exam period, "which specifically encompassed the month of April 1993," but no testimony was elicited at the hearing in this regard. Gadwell Aff. ¶ 3.

Rizo testified that he left campus with Poole, at noon, on April 30, 1993. Tr. 7/27 17:24-25. The undersigned notes that, although the testimony offered by Rizo and his affidavit provide a detailed account of what transpired in April 1993, Rizo testified that he did not provide Armstrong with those details prior to the trial. Tr. 7/27 63:19-25.

### De la Torre Robbery (Counts 9, 10); November 24, 1993:

Rizo was charged in counts 9 and 10 with participating in the De La Torre Robbery on November 24, 1993. Rizo contended that he provided Armstrong with the names of the following witnesses with respect to his whereabouts on November 24, 1993: Joe Meadow, Juliana's father, Vines Turk, a Meadow family friend, Juliana, and Gadwell.

Juliana's affidavit stated that, "[p]rior to the closing of the residence halls on [November 23, 1993], Abel Rizo informed me that he was driving to Miami, Florida with his teammate, Mark Gadwell." Juliana Aff. ¶ 11. Juliana testified that her father came to pick her up on November 23, 1993. Tr. 7/26 160:1-7. She did not see Rizo again until November 26, 1993. Tr. 7/26 160:8-9. Meadow testified that he met Rizo at a football game, at about 6:30 p.m., on the Friday after Thanksgiving, which was November 26, 1993. Tr. 7/26 143:3-4.

Gadwell's affidavit set forth that he and Rizo left Tennessee, at noon, on November 24, 1993, and did not arrive in South Florida until sunrise on November 25, 1993, Thanksgiving Day. Gadwell Aff. ¶ 5. Gadwell testified that he had a make-up exam on the morning of November 24, 1993. Tr. 7/26 120:13-15. However, Gadwell's affidavit failed to mention the make-up exam. Tr. 7/26 132:1-6. When questioned about this omission in his affidavit, executed years before, Gadwell did not provide a satisfactory answer. Tr. 7/26 132:11-21; 133:2-7. Gadwell testified further that, due to construction on Interstate 24 between Nashville and Chattanooga, the trip from Tennessee to Florida, which usually took about 17 hours, took about 19 hours. Tr. 7/26 122:2-6. Rizo and he started throwing a football in the grassy median part of the interstate because traffic was completely stopped. Tr. 7/26 122:16-22. They arrived in Boca Raton at day break between 6:30 a.m. and 7:00 a.m. Tr. 7/26 122:7-9.

Rizo testified that he and Gadwell left campus on November 24, 1993, between noon and 1:00 p.m. Tr. 7/27 66:3-9; 67:3-10. Due to a traffic backup on the interstate, they arrived in Boca Raton, FL, to drop off Gadwell, at sunrise, on November 25, 1993, Thanksgiving Day. Tr. 7/27 68:22-25; 69:1-10. It took about 20 or so hours to go from Lambuth, TN, to Boca Raton, FL. Tr. 7/27 70:3-7. Rizo then drove to Key Largo, FL, Tr. 7/27 69:23-25, which he estimated took about an hour-and-a-half. Tr. 7/27 70:15-17. Rizo testified that he arrived in Key Largo between 8:00 a.m. and 8:30 a.m. Tr. 7/27 71:23-24. Only Rizo's mother was home. Tr. 7/27 71:13-16. Rizo showered, had something to eat, and spoke to his mother. Tr. 7/27 72:9-14. Rizo told his mother that he had turned down an invitation to spend Thanksgiving with Juliana, because he was afraid of meeting her parents. Tr. 7/27 72:20-24. His mother told him that he was silly for not going. Tr. 7/27 73:2. After being home for four to five hours, while it was still light outside, Rizo left Key Largo for Hoover, Alabama. Tr. 7/27 25:3-8; 73:3-7. Rizo testified that he passed Hoover and ended up in Tuscaloosa, AL. Tr. 7/27 23:25; 24:1. Although he had no idea how long it took him to drive from Key Largo to Tuscaloosa, Tr. 7/27 73:23-25; 74:1-2, it was dark when he stopped at a hotel in Tuscaloosa. Tr. 7/27 74: 3-8. On the following day, he called Juliana, at about 3:00 p.m., from a pay phone in Tuscaloosa. Tr. 7/27 75:23-25. Rizo then arrived in Hoover, AL, between 6:00 p.m. and 7:00 p.m., on November 26, 1993, in time for Juliana's brother's football game. Tr. 7/27 77:10-13.

### Court's findings and conclusions

Abel Rizo was a young man when he was incarcerated. His prison sentence is quite lengthy. The Court has given extensive consideration, over the last several months, to all of the evidence adduced in connection with this matter. After studying the testimonial and documentary evidence, it is evident to the undersigned that there has been no injustice committed here.

The court finds that, for the most part, the evidence was contradictory and failed to support the contention that Armstrong rendered ineffective assistance by neglecting to contact and present alibi witnesses on Rizo's behalf. Moreover, with respect to the substance of their purported alibi testimony, the various witnesses contradicted themselves and each other and fell short of providing an alibi for Rizo's whereabouts on the dates of the alleged crimes.

Undoubtedly, there was a direct contradiction between the testimonies of Armstrong and Rizo regarding the information provided as to the potential alibi witnesses. In cases where there is conflicting testimony and the Court is called upon to make a factual determination, it is within its province to weigh the credibility of the witnesses to resolve the factual dispute. See Castle v. Sangamo Weston, Inc., 837 F.2d 1550, 1559 (11th Cir. 1988) ("Assessing the weight of evidence and credibility of witnesses is reserved for the trier of fact."). In so doing, the Court takes into account the interests of the witnesses in the outcome of the hearing, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand. U.S. v. Ramirez-Chilel, 289 F.3d 744, 749-750 (11th Cir. 2002). Here, having heard the testimony of the witnesses and observed their demeanor, and taking into account the witnesses' interests in the outcome of these proceedings, the Court finds the testimony of Armstrong more credible than the testimony of Rizo and his witnesses.

Both Rizo and Juliana testified that they provided Armstrong with the names of several alibi witnesses prior to trial. Armstrong denied having ever received a list of names of potential alibi witnesses from anyone. In his 2002 affidavit and at the hearing, Rizo testified that he provided Armstrong with a list of nine names, but no contact information. Juliana testified that, in December 1996, she sent Armstrong a facsimile listing eight witnesses, but could not find a copy of that fax

or proof that it was, in fact, sent to Armstrong. Importantly, included among the names that were purportedly provided to Armstrong prior to trial were the names of witnesses whose relevance only became apparent during the trial in March of 1997. At the hearing, when asked how, prior to trial, he could have known that several witnesses would be relevant as alibi witnesses when he did not learn of his alleged involvement in the Carmelo rip off until the middle of trial, Rizo admitted that there was no way he could have known same at the time he executed his affidavit. Tr. 7/27 102:19-22. Further, Juliana claimed that she contacted all of the witnesses prior to trial to ascertain their availability. Simmons claimed to have contacted Armstrong by phone and via facsimile prior to trial but had no proof thereof. Poole and Gadwell testified that they were first contacted for sentencing, not trial. Moreover, Gadwell testified that he was contacted by Rizo's attorney, not Juliana.

Although not part of the basis for the Court's ruling, the undersigned notes that, Armstrong had no motive for not contacting the witnesses, particularly when his client was indicating that they would have been able to provide an absolute voucher of his whereabouts on the dates of the alleged crimes. It would have been to Armstrong's benefit, at a minimum, to contact the witnesses given a possibility of establishing that Rizo was not present at the crime scenes. The Court notes that Mr. Armstrong is a long-standing member of the Florida bar with a sound reputation and over 30 years' legal experience.[12] The Court is hard-pressed to believe that any counsel, even one fresh out of law school, when presented with a slew of alibi witnesses ready, willing and able to provide slam-dunk testimony, would ignore a rare opportunity to exonerate a young client facing a significant portion of his lifetime in prison.

---

[12] Pursuant to the testimony, Armstrong began his career at the Dade County Public Defender's Office and later went into private practice. Tr. 7/27 113:5-7; 114:20-22. He has participated in hundreds of jury trials. 7/27 114: 14-19.

Moreover, Rizo had everything to gain by establishing plausible alibis and so had every motivation to provide Armstrong with the witness information. He was a young man, newly married, facing the majority of his adult life in prison. It is unreasonable to conclude that a defendant facing a lengthy punishment for a crime he was certain he did not commit would not have insisted that his attorney contact all of the witnesses, or vice versa, especially when the witnesses were his friends, or, at the very least, would not have alerted the trial judge that his attorney was committing a colossal mistake in not having called the several alibi witnesses that would have exonerated him and were ready to testify on his behalf. Indeed, Rizo never complained to his father, his father's lawyer, or the judge that Armstrong had not contacted the alibi witnesses. Tr. 7/27 97:17-19; 98:7-9; 10-17.

The more reasonable conclusion is that Rizo failed to provide adequate information to Armstrong regarding the possible alibi witnesses, perhaps because there were none. Then, years later, after having pored over the trial transcripts, he attempted to reconstruct alibis that would match up to the dates of the crimes. This conclusion is bolstered by the inconsistencies between the affidavits provided by the witnesses and their testimony at the hearing, as well as the inconsistencies among the witnesses themselves.

Rizo and Juliana's testimony regarding what names were provided and when they were provided to Armstrong is suspect. The undersigned accords little evidentiary weight to the letter/fax produced by Juliana at the hearing and the accompanying witness testimony. Undoubtedly, the testimony seems to comport to a version of the facts that only became available from studying the post-trial transcripts. As the government observed, it appears that Rizo attempted to cobble together a post-verdict alibi defense with the benefit of the trial transcript. Based upon the documentary and testimonial evidence, the undersigned finds that the information that was provided to Armstrong

regarding alibi witnesses was inconsistent and scant. Rizo blamed Armstrong for failing to pull witnesses out of thin air when he and his former wife were the only ones who would have had the pertinent information. There is a duty to investigate squarely upon counsel's shoulders. However, there is no requirement that counsel exercise superhuman powers of divination.

Insofar as Armstrong testified that he was unaware of the existence of certain witnesses, he cannot be deemed deficient for failing to investigate same. See Cox v. State, 966 So.2d 337, 363 (Fla. 2007) (quoting Sims, 155 F.3d at 1316) (Explaining that counsel cannot be deemed deficient for failing to investigate a witness of whom he was unaware); Rhodes v. Secretary, Dept. of Corrections, No. 8:09-CV-1350-T-17TBM, 2010 WL 3819358, at *25 (M.D. Fla. Sept. 30, 2010) ("Where a defendant fails to provide a list of potential witnesses to his attorney, that defendant is not allowed to later complain that those witnesses were not contacted on his behalf.") (citations omitted); Griffin v. Secretary, Dept. of Corrections, No. 8:09-CV-1816-T-17MAP, 2010 WL 3467145, at *14 (M.D. Fla. Aug. 31, 2010) (Trial counsel "cannot be found ineffective in not interviewing or calling witnesses of whom he had no knowledge"). Rizo cannot fault Armstrong for failing to contact witnesses about whom he had no knowledge.

Notwithstanding, even if Armstrong had been privy to the information adduced at the hearing regarding the witnesses, he testified that it was unlikely that he would have chosen to present their testimony at trial because it fell short of providing an adequate alibi for Rizo's whereabouts on the dates in question. Evans v. State, 995 So.2d 933, 944 (Fla. 2008) (Failure to present testimony of an alibi witness is not deficient for purposes of an ineffective assistance of counsel claim, where such testimony would have offered an incomplete alibi). As noted, the testimony of the witnesses was, at times, contradictory and inconsistent and would have likely served to underscore that Rizo was,

in fact, in Miami on the dates of the charged crimes. After considering the testimony of the alibi witnesses, the undersigned finds that Armstrong's actions were within the realm of reasonable strategic decisions allotted to trial counsel and entitled to deference by this Court.

Furthermore, given these circumstances, had Armstrong presented the alibi testimony, it is unlikely that the outcome at trial would have been different. With respect to the Lozano robbery and the Puerto Rico rip off, as noted herein, there was no sustainable alibi for these offenses. The only possible witness was Rizo's grandfather, and he could not vouch for his whereabouts on the relevant dates. With respect to the Carmelo rip off, it was not charged in the indictment and did not arise until the middle of trial. Because Armstrong would have had no reason to investigate this time period prior to trial, no claim for ineffectiveness can stand in regard to this offense.

With respect to the Cano robbery count, there were inconsistencies in the affidavits provided by Simmons, Juliana and Gadwell regarding the dates that Rizo assisted Simmons in packing her car, as well as inconsistencies between the affidavits and the testimony elicited at the hearing with respect to the dates of departure and even what was packed into the car. Poole testified that he helped pack Simmons' car after his exams ended, on April 29, 1993. Then, he testified that it was on April 30, 1993. Juliana contradicted her affidavit by testifying at the hearing that they packed the car on April 29 and April 30, 1993. Rizo left campus either on April 29 or April 30, 1993, but not both. These incongruities would have highlighted the possibility that Rizo was present in Miami on April 30, 1993, which would be consistent with Rizo being in Miami a day or two prior to April 30, 1993, as Armstrong testified that Rizo had advised him.

With respect to the De la Torre count, it would seem likely that Rizo left Tennessee before Juliana, who testified that she left on November 23, 1993. Again, this would be consistent with

Armstrong's testimony that Rizo told him he arrived in Miami a day or two prior to the robbery. Surely, Rizo would have waited with Juliana given that the two were "attached at the hip," Tr. 7/26 48:17-18, and were always together, Tr. 7/26 95:17-18. Otherwise, the Court would have to believe that Rizo drove over 20 hours from Lambuth, TN, to Boca Raton, FL, then drove another couple of hours to Key Largo, FL, only to spend 4-5 hours at home with his mother on Thanksgiving Day, then proceeded to drive another 15 hours to Alabama, accidentally passing Hoover, where Juliana lived, and ending up in Tuscaloosa, AL, where he rented a room overnight to sleep, then, on the following afternoon, drove another hour to Hoover arriving past 6:00 p.m.

Even assuming *arguendo* that Armstrong's performance was deficient, Rizo failed to demonstrate that any prejudice resulted therefrom. Confidence in the outcome of this case was not undermined by the missing testimony of the alibi witnesses and evidence, because their testimony fell short of providing an alibi and lacked credibility, and the government's case was sound.

### Conclusion

The undersigned concludes that Rizo failed to provide Armstrong with adequate information regarding the identity of the potential alibi witnesses, their contact information, or what their testimony would have been. Without such information, Armstrong could not be faulted for not presenting same. Moreover, Armstrong testified that, had he been privy to the testimony of the witnesses who appeared at the hearing, he still would not have advanced an alibi defense as a matter of strategy because they failed to provide an adequate alibi. Even assuming deficient performance by Armstrong, presentation of the alibi witnesses would not have affected the outcome of the proceedings in this case. There is little doubt that the witnesses fell short of providing a plausible alibi for Rizo with respect to the alleged crimes. Thus, the undersigned is satisfied that no claim for

ineffective assistance of counsel can stand under either of the Strickland prongs.

### Recommendation

Based upon the foregoing, it is hereby **RESPECTFULLY RECOMMENDED** that Petitioner's ineffective assistance of counsel claim as set forth in his Motion to Vacate, Set Aside, or Reduce Sentence Pursuant to Title 28 U.S.C. § 2255 (ECF No. 1) be **DENIED**.

**RESPECTFULLY RECOMMENDED** in Chambers, at Miami, Florida, this ___ day of September 2013.

**WILLIAM C. TURNOFF**
**United States Magistrate Judge**

cc  Hon. Patricia A. Seitz
    Counsel of Record